IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 04-cv-01987-PSF-PAC

SHARON B. OSBORN,

    Plaintiff,

v.

QWEST CORPORATION;
QWEST EMPLOYERS BENEFIT COMMITTEE; and
QWEST MANAGEMENT SEPARATION PLAN,

    Defendants.

---

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

This matter comes before the Court on Defendants' Motion for Summary Judgment (Dkt. # 37), filed July 29, 2005. Plaintiff filed her opposition to the motion on August 15, 2005 and defendants filed a reply on September 2, 2005. A Final Pretrial Order was entered thereafter on September 20, 2005. The matter is set for a three-day trial to the Court to commence on December 12, 2005. Defendants' motion is ripe for determination.

**THE PARTIES' CLAIMS AND DEFENSES**

Plaintiff Sharon Osborn, a long-time management employee of Defendant Qwest Corporation ("Qwest"), filed her complaint on September 24, 2004. She alleges that her employer Qwest, and Defendants Qwest Management Separation Plan ("QMSP") and Qwest Employee Benefits Committee ("EBC"), discriminated against her and violated her rights under Section 510 of the Employee Retirement Income Security

Act ("ERISA"), 29 U.S.C. § 1140, by terminating her and subsequently denying her separation benefits.

Specifically, plaintiff alleges she was discharged from her long-term management employment on December 2, 2003 at a time when her workgroup was undergoing a reduction in force ("RIF") and when the QMSP was providing special severance benefits to surplus managers. The incident that led to her termination was a verbal and physical altercation that occurred in November 2003,[1] while plaintiff was in a convenience store during a personal work break, with an individual who unbeknownst to plaintiff was a fellow Qwest employee. After the incident was reported to Qwest an investigation by Qwest management ensued, and afterwards both plaintiff and the fellow employee were terminated. Plaintiff alleges that she was involuntarily terminated due to false accusations of violating the Qwest Code of Conduct, and false contentions that she had engaged in conduct injurious to Qwest.

Plaintiff avers that the real reason she was terminated was to prevent her from receiving severance benefits under QMSP that would have been available if she had not been terminated for cause. She claims, therefore, that Defendant Qwest violated Section 510 of ERISA by intentionally discriminating against her for the purpose of interfering with her attainment of rights to severance benefits under the QMSP. Plaintiff further alleges that by falsely determining that she had engaged in misconduct injurious

---

[1] The parties are not quite in agreement as to the date of the incident, with defendants stating it occurred on or about November 17, 2003 (Defendants' Brief at 3) and plaintiff stating it occurred on November 19, 2003 (Plaintiff's Opposition at 4).

to Qwest, and was thereby prevented from receiving the QMSP severance benefits equivalent to a year's base annual salary.

Before filing her civil action, plaintiff alleges that she exhausted the two-step administrative claims process under ERISA seeking the QMSP severance benefit, but Defendants denied her claim. Both the QMSP Administrator, Michael Ward, and the Qwest EBC denied her claim, she asserts, relying specifically upon Section 1.5(d) of the QMSP. Plaintiff claims Defendants engaged in a breach of fiduciary duty under Section 404(a) of ERISA, 29 U.S.C. § 1104(a), as they failed to provide her a full and fair review of her claim, and again discriminated against her in violation of Section 510 of ERISA as other managers who had engaged in misconduct causing harm to the company were allowed to receive the QMSP benefits.

Plaintiff seeks equitable relief, including a remand to EBC with an order directing it to conduct a full and fair review of her claim, other equitable relief allowable under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), including reinstatement of employment with an award of lost earnings, as well as prejudgment interest, attorney's fees and costs. It does not appear that she expressly seeks an award of the severance pay she claims to have been denied.

Defendants assert that plaintiff was terminated solely as a result of the altercation, that its investigation reflected a violation of multiple provisions of the Qwest Code of Conduct, and therefore the plaintiff's termination was a proper application of Qwest's employment policies. Moreover, defendants contend that plaintiff's termination was unrelated to the subsequent downsizing that occurred at Qwest, that the decision

to make reductions in plaintiff's department was not made until after she was terminated, and that in any event there is no evidence that plaintiff would have been included in the RIF so as to have been eligible for the severance package as she claims. Defendants also assert that Defendants QMSP and EBC are not proper parties to this case as those entities had no authority to terminate plaintiff and no input into the termination decision.

**APPLICABLE LAW**

Section 510 of ERISA provides that it is unlawful for "any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . ." 29 U.S.C. § 1140. In *Phelps v. Field Real Estate Co.*, 991 F.2d 645, 649 (10th Cir. 1993), the Court held that a plaintiff in a case brought under Section 510 of ERISA is required to prove by a preponderance of the evidence that his discharge was motivated by an intent to interfere with employee benefits protected by ERISA. Both parties cite to *Garratt v. Walker*, 164 F.3d 1249, 1256 (10th Cir. 1998) for the proposition that such intent is present where the denial of benefits is a motivating factor in the employer's decision. In *Garratt* the court stated that a violation of Section 510 may be established where "a trier of fact could find that a motivating factor behind the employer's terms was to discriminate in favor of himself and against the employee in order to save the cost of the employee's participation in the plan." 164 F.3d at 1255. Also, both parties cite to *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 141 (2000) for the proposition that a factor is motivating if it

had a "determinative influence" on the employer's decision.  Both parties agree that circumstantial evidence may be used to establish such prohibited employer intent (Defendants' Brief at 12; Plaintiff's Opposition at 19).  Despite their agreement on the applicable principles of law, the parties diverge on the application of the law to the facts of this case.

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants seek summary judgment in their favor as to all of plaintiff's claims asserting that there are no genuine disputes of material fact as to any of the essential elements of the plaintiff's claims.  They further argue that, as a matter of law, Defendants QMSP and EBC are not proper parties to this action.

In a 25-page brief, supported by many exhibits including deposition and affidavit testimony of at least eight witnesses, defendants meticulously detail the events surrounding the company's decision to terminate plaintiff and the company's decisions regarding the downsizing, urging that the two decisions occurred on parallel tracks that never intersected.  Therefore, Defendants argue, there is no evidence that the employer's motivation to terminate plaintiff was to avoid paying the severance benefits that would be available under the QMSP.

In a comparably long and detailed opposition brief, also supported by numerous exhibits and excerpts from at least eight depositions, plaintiff details her version of the events surrounding her termination and the company's downsizing decision, arguing the several points of intersection.  Plaintiff contends that summary judgment cannot

be granted because a factfinder could infer that she was terminated with the intent of depriving her of the separation benefits available under QMSP.

In a lengthy reply brief, accompanied by five more exhibits including additional deposition testimony and an affidavit explaining prior deposition testimony, defendants urge that plaintiff has failed to demonstrate issues of disputed facts.

**STANDARD OF REVIEW**

The purpose of summary judgment is to determine whether a trial is necessary. *White v. York Int'l. Corp.,* 45 F.3d 357, 360 (10th Cir. 1995). As the parties acknowledge, summary judgment is appropriate under F.R.Civ.P. 56(c) only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). When applying this standard, the Court reviews the pleadings and the documentary evidence in the light most favorable to the non-moving party. *Gray v. Phillips Petroleum Co.,* 858 F.2d 610, 613 (10th Cir. 1988).

**ANALYSIS**

On the record before it, the Court cannot say that there are no disputes of material facts relating to plaintiff's claims. The following are some, but not all, of the material issues that appear to be in dispute that preclude a grant of summary judgment at this time on the record before the Court.

1.  <u>The Timing of Plaintiff's Termination and Qwest's Downsizing</u>

Defendants argue, citing to plaintiff's deposition testimony, that plaintiff admits that her conduct in the convenience store was improper, that it amounted to violation of a company policy, that the company's investigation was undertaken in good faith, and that she has no reason to believe the managers making the termination decision had anything other than a good faith belief that the facts set forth in the investigation report were true (Defendants' Brief at 6).

Plaintiff, on the other hand, asserts that defendants mischaracterize her testimony and that she only testified that the conduct would be improper if it occurred at a Qwest worksite or Qwest location (Plaintiff's Opposition at 7). The Court's review of plaintiff's deposition testimony indicates that what plaintiff testified to was that had the altercation occurred at the workplace she would not have acted in the same manner (Osborn Depo. at 55-56, 59, Exhibit A to Defendants' Brief). However, plaintiff also testified that her conduct as it occurred was appropriate "[g]iven the circumstances" but that she wished she could have "just walked away." (*Id.* at 58). Plaintiff also testified that she believed the investigation report contained inaccuracies (*id.* at 94), and she advanced sworn deposition testimony indicating that her manager could not recall reading the investigation report prior to authorizing her termination. (Nickell Depo. at 7-8, Exhibit 3 to Plaintiff's Opposition).

The defendants assert that the decision to terminate plaintiff was made on Wednesday, November 26, 2003, the day before the Thanksgiving holiday (Defendants' Brief at 5). Defendants further assert that the downsizing was not

announced and final details were not provided by Senior Vice-President Roland Thornton until Monday morning, December 1, 2003 (Defendants' Brief at 7).  Therefore, defendants submit the persons responsible for plaintiff's termination could not have taken into account the downsizing when she was terminated on November 26, 2003.

However, the stipulated facts set forth in the Final Pretrial Order (Dkt. # 49), filed on September 20, 2005, state that plaintiff "was terminated on or about December 2, 2003."  (Final Pretrial Order at 7).  Assuming defendants are correct about the date Mr. Thornton made his decision, the stipulated date of plaintiff's termination was after the announcement of the downsizing decision.  Moreover, it appears from testimony by plaintiff's supervisor Mark Nickell, that the decision made at the time plaintiff's supervisors were considering discipline was to "suspend" plaintiff for a "temporary period of time" and not to permanently terminate her employment (Nickell Depo. at 36-37, Exhibit 3 to Plaintiff's Opposition).

Defendants assert that plaintiff admitted in her deposition there was no evidence that on the day of her termination those involved in the decision knew how work groups would be affected by the potential downsizing, or even if it would occur (Defendants' Brief at 7).  Yet the same deposition testimony shows that plaintiff testified that her supervisor, Mr. Nickell, acknowledged, before the altercation that her department was looking at downsizing and he was looking for volunteers (Osborn Depo. at 85-86, Exhibit A to Defendants' Brief).  Moreover, in an affidavit plaintiff swears under oath that as early as November 18, 2003 Mr. Nickell told her and co-workers that a

-8-

downsizing in their department was going to occur by December 6, 2003.  *See* Exhibit 1 to Plaintiff's Opposition, containing plaintiff's affidavit dated March 29, 2004 at ¶ 2.

Based on such apparently conflicting evidence, the Court cannot say that it would be unreasonable for a factfinder to infer, after hearing all the evidence, that the employer's termination under these circumstances supports a finding that it was motivated by an intent to deprive plaintiff of severance benefits.

    2.    <u>Whether Plaintiff Would Have Been Selected for Inclusion in the Downsizing</u>.

Defendants assert that even if plaintiff's supervisors knew of the potential downsizing at the time of her termination, plaintiff has no evidence to demonstrate that she would have been selected for the RIF (absent her termination) so as to make her eligible for the severance package (Defendants' Brief at 16-17).  Although defendants do not provide any authority from the Tenth Circuit or this district, they advance at least one case which plausibly holds that a plaintiff alleging discriminatory denial of benefits under ERISA must "first show that management had either already selected him to be a RIF participant or that management intended in the future to select him."  *Anglin v. Sears, Roebuck and Co.,* 2004 WL 1197355 at *14 (N.D. Ill., May 28, 2004).[2]

---

[2] This statement in *Anglin* refers to two earlier decisions by the same district judge, one found at *Anglin v. Sears, Roebuck and Co.*, 1993 WL 437430 (N.D. Ill., Oct. 27, 1993) and one at *Anglin v. Sears, Roebuck and Co.*, 179 F. Supp. 2d 836 (N.D. Ill. 2001).  In the earlier of these two cases, the district judge made the statement regarding proof of inclusion in the RIF solely in the context of denying a motion to remand the case to state court based on federal question preemption, finding that plaintiff's theory that he would have been included implicated ERISA.  1993 WL 437430 at *3-4.  In the second case, the district judge made the statement in the context of defining plaintiff's damages theory, and striking a theory that sought damages for future lost earnings. 179 F. Supp. 2d at 839-40.  Notwithstanding the apparent dicta of the proposition in the earlier *Anglin* decisions, the logic of the court's rulings appear to apply to the facts of the instant case.

As noted, defendants assert plaintiff has no such evidence that she had been or would have been selected for the RIF.  They contend that in the case of a downsizing, employees are selected either because their job is being eliminated or because the particular employee was a lower performer in a work group (Defendants' Brief at 17). Here, defendants assert, plaintiff's job was not eliminated after she left.  Moreover, they quote plaintiff's own testimony that she herself did not believe she would have been selected for the downsizing (Defendants' Brief at 8).

To be sure, if *Anglin* correctly states the law under Section 510 of ERISA, plaintiff's claim on this element may well be on thin ice.  However, plaintiff does offer some evidence that she would have been selected for the RIF.  First, she cites to her name appearing on a document titled "Roland Thornton Organization Reduction Detail." (Exhibit 13 to Plaintiff's Opposition).  While the documents is undated, and contains no narrative explanation of its contents, at least one management employee who was involved in compiling the document testified that it contained names provided to him by managers of persons who had been "identified for headcount reduction." (Hammer Depo. at 47, Exhibit 4 to Plaintiff's Opposition).  Because the exhibit does reference plaintiff by name, it could be inferred that she was a RIF candidate prior to her termination.

In addition, while it is true that plaintiff's job was not eliminated, neither was her position filled after she left.  Rather, as defendants candidly admit, her job duties were shifted to other employees (Defendants' Brief at 8, 17-18).  Of course, such a

reallocation of job responsibilities may have the same effect as position elimination insofar as cost savings are concerned.

While such evidence may ultimately fall short of proving that plaintiff had been selected for the RIF, or would have been selected for the RIF, it at least provides that more than a scintilla of evidence from which an inference to that effect may be drawn by the factfinder. Accordingly, on this state of the record, the Court cannot state that there is no evidence to support a necessary element of plaintiff's case.

    3.    <u>Whether Defendants QMSP and EBC are Proper Parties</u>.

Defendants QMSP and EBC separately assert that they are not proper defendants to this case, as they had no role in "altering or disrupting" the employer-employee relationship, and accordingly they cannot be defendants to a claim brought under Section 510 of ERISA (Defendants' Brief at 23). However, as plaintiff explains in her opposition, she also alleges a claim against the QMSP and the plan administrator, EBC, for breach of the fiduciary duties created under Section 404 of ERISA, 29 U.S.C. § 1104(a). Plaintiff's Opposition at 22-25.

Defendants reply that such a claim was never pled by plaintiff in her complaint as plaintiff only asserted claims under Section 510 (Defendants' Reply at 13-14). The Court agrees that plaintiff's pleading is not a model of clarity, asserting as it does only one claim for relief titled "Discrimination and Interference in Violation of ERISA Section 510." However, the language contained in the body of the claim certainly cites to Section 404 of ERISA, and pleads breaches of fiduciary duty by EBC. *See* Complaint at ¶¶ 40-42, 47). The complaint also seeks relief consistent with allegations of breach

of fiduciary duty, including a remand to the EBC for further review of plaintiff's claim for benefits. (*Id.* at ¶ 51 and Prayer for Relief, ¶¶ A, B and C). Defendants were certainly put on adequate notice of plaintiff's claims for breach of fiduciary duties. The have also failed to show any prejudice in defending against such a claim in light of the cognate Section 510 claim.

Defendants further argue, relying on *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996), that plaintiff's claims for equitable relief for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3) are not available here because plaintiff can avail herself of the civil enforcement provisions under 29 U.S.C. § 1132(a)(1)(B) to remedy her individual claim of wrongful denial of benefits. Citing further to other cases including *Klover v. Antero Healthplans*, 64 F. Supp. 2d 1003, 1012-13 (D. Colo. 1999), defendants urge that when an asserted breach of fiduciary duty claim is "essentially an equitable, alternative claim" to a plaintiff's claim for recovery of benefits, the equitable claim is improper, and the plaintiff should be required to proceed under 29 U.S.C. § 1132(a)(1)(B) only (Defendants' Brief at 15). Defendants readily point out that the standard of review for a denial of benefits claim, which they characterize as "strict abuse of discretion standard," might render plaintiff's claim to be one she could not win, thereby explaining why she seeks to proceed under a claim for equitable relief under 29 U.S.C. § 1132(a)(3) (Defendants' Reply at 16).

Defendants are certainly correct that *Varity* states that "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be

'appropriate.'" 516 U.S. at 515.  However, as this statement was applied in *Klover v. Antero Healthplans*, *supra*, it only precluded the equitable claim when "there is no need for equitable relief and such relief is no longer 'appropriate,'" 64 F. Supp. 2d at 1013, but did not preclude equitable relief where the equitable claim sought "appropriate" equitable relief "apart from the award of benefits already addressed . . . ." *Id.*  Thus, the question here is whether plaintiff seeks appropriate equitable relief apart from any claim for benefits.[3]

Plaintiff requests injunctive relief either remanding this case to the EBC for a renewed evaluation, or injunctive relief requiring the EBC to declare that plaintiff did not violate the Qwest Code of Conduct and did not engage in conduct that caused "injury" to Qwest (Complaint at pp. 8-9).  She apparently requests this alternative relief because of the uncertainty in the record as to exactly why plaintiff was denied severance benefits, and the uncertainty of whether the Defendants EBC and QMSP discharged their fiduciary duties to her.

The Court finds that the record is unclear as to the basis for denying plaintiff's request for severance pay under the QMSP, thus raising questions as to the discharge of fiduciary duties by Defendants QMSP and EBC.

Mr. Michael Ward, whom defendants describe as the person designated by the plan administrator, EBC, to make initial benefits decision (Defendants' Brief at 9-10) essentially states in his affidavit that his decision to deny severance benefits to plaintiff

---

[3] Plaintiff has not expressly asserted a claim for wrongful denial of benefits under 29 U.S.C. § 1132(a)(1)(B), although defendants appear to argue in the alternative that she has (Defendants' Reply at 16).

was due to the fact that she was terminated for "cause," as that term is defined in Section 1.5 of the QMSP, and that employees terminated for cause are rendered ineligible for benefits under the plan.[4] (Ward Affidavit at ¶¶ 4, 5, Exhibit L to Defendants' Brief).

"Cause" is defined in various ways in Section 1.5 of the QMSP, but Ward does not identify exactly which subparagraph he found applicable to plaintiff. It appears to the Court that the possibly applicable subparagraphs of the definition of "Cause" are either definition (a) which defines cause as "misconduct that results in injury to Qwest;" or definition (d) which defines cause as "violation of the Qwest Code of Conduct or other Qwest policies resulting in injury to Qwest, each as determined in the sole and absolute discretion of Qwest." Section 1.5 of QMSP, Exhibit N to Defendants' Brief at p. 8. The Court has not located in the record a document that expressly sets forth the "cause" for which plaintiff was allegedly terminated, nor the definition of cause which Mr. Ward applied. The Court does note that Exhibit D to Defendants' Brief, a description of the investigation of the incident involving plaintiff, indicates that the corporate policy at issue in the investigation was "Off Duty Misconduct and Workplace Violence," and that the document alludes to violations of the Qwest Code of Conduct (Exhibit D to Defendants' Brief at pp. 2, 4). However, the Court has located no document which expressly states the exact reason for plaintiff's termination.

---

[4] Although not expressly refernced in Ward's affidavit, Section 1.12 of the QMSP excludes from the definition of eligible employees those terminated for "Cause." *See* Section 1.12(e) of QMSP, Exhibit N to Defendants' Brief at p. 9).

In any event, whether plaintiff was denied benefits because she was terminated for cause under subparagraph (a) of the definition contained in section 1.5 of the QMSP, or under subparagraph (d), it appears that the plan decision-maker must make a determination under definition (a) that the misconduct results in "injury to Qwest," or under definition (d) that the violation, whether of the Qwest Code of Conduct or of some other Qwest policy, resulted in "injury to Qwest."[5]

Here, Mr. Ward appears to have testified in his deposition that he found it unnecessary to determine whether there was "harm" to the company, and therefore he did not perform any such analysis (Ward Deposition, Exhibit 5 to Plaintiff's Opposition at p. 58). Rather, he appears to have concluded that plaintiff was terminated for violating the Qwest Code of Conduct, and he seems to have inferred that any violation of the Code of Conduct could lead to "problems for Qwest" or be "detrimental to the company or harmful to the company." (*Id.* at p. 59).

Mr. Ward's assessment may well be correct, but a review of the excerpt from the Qwest Code of Conduct, attached to Plaintiff's Opposition as Exhibit 12, does not indicate that the paragraph providing for discipline for "Conduct off the Job," requires

---

[5] For Colorado employees C.R.S. § 24-34-402.5 forbids the termination of an employee due to engaging in lawful activity "off the premises of the employer during nonworking hours." Allowable exceptions to this proscription include when the restriction against such activity relates to a bona fide occupational requirement, or is reasonably and rationally related to the employment activities and responsibilities of a particular employee or a particular group of employees, rather than to all employees of the employer. C.R.S. § 24-34-402.5(1)(a). The provision of the QMSP that relates termination for "Cause" to a finding of injury to Qwest may well be an acknowledgment of the applicability of this statutory requirement to the termination policy of Qwest management employees in Colorado, or the statute may be a possible interpretive guide to the construction of the policy.

a finding of harm, or detriment, or problems for the company, in order for a violation to occur. Rather, that excerpt says an assessment will be made on a "case by case" basis to determine whether the conduct has an effect "on Qwest's interests." (Exhibit 12 to Plaintiff's Opposition at p. 2). The Court has not located such an assessment in the record, although it may well be there, and has not been shown that Mr. Ward considered such an assessment if one was made.

Thus, the Court cannot say on this record that the plaintiff's request for injunctive relief either in the form of an order directing the EBC to change its findings, or in the form of an order directing a remand for further findings, is not appropriate relief to be had as an alternative to a request for an award of benefits. It may well be that by the Final Trial Preparation Conference or at trial plaintiff will have to elect between these possible remedies, but at this time summary judgment on such a claim is not warranted.

Accordingly, the Court cannot find at this time that Defendants EBC and QMSP are entitled to summary judgment in their favor based on the holding in *Varity Corp., supra*.

**CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgment (Dkt. # 37) is DENIED.

DATED: November 8, 2005

BY THE COURT:

*s/ Phillip S. Figa*

_____
Phillip S. Figa
United States District Judge